

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00086-CV

———————————————————

IN RE: THE COMMITMENT OF ROGER DALE GIBSON

On Appeal from the 372nd District Court
Tarrant County, Texas
Trial Court No. D372-S-15388-23

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

Appellant Roger Dale Gibson appeals his civil commitment as a sexually violent predator. *See* Tex. Health & Safety Code Ann. § 841.081(a). He contends that the evidence was factually insufficient to support the jury's finding that he had a behavioral abnormality making him likely to engage in a predatory act of sexual violence. *See id.* § 841.003(a)(2). We disagree and will affirm.

## I. Governing Law

The Sexually Violent Predator Act authorizes the civil commitment of a person if a jury determines, beyond a reasonable doubt, that the person qualifies as a "sexually violent predator," i.e., that he "(1) is a repeat sexually violent offender;[1] and (2) suffers from a behavioral abnormality that makes [him] likely to engage in a predatory act of sexual violence." *Id.* §§ 841.003(a), .081(a). A "behavioral abnormality" refers to "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* §§ 841.002(2), .003(a)(2). Such an abnormality must cause the person serious difficulty in controlling his behavior. *In re Commitment of Gonzalez,* No. 02-21-00238-CV, 2022 WL 1183219, at *9 (Tex. App.—Fort Worth Apr. 21, 2022,

---

[1]A "repeat sexually violent offender" includes a person who has been "convicted of more than one sexually violent offense and a sentence [has been] imposed for at least one of the offenses." Tex. Health & Safety Code Ann. § 841.003(b); *see id.* § 841.002(6).

pet. denied) (mem. op.) (quoting *In re Commitment of Thompson*, No. 06-20-00024-CV, 2020 WL 6066205, at *1 (Tex. App.—Texarkana Oct. 15, 2020, pet. denied) (mem. op.)).

Here, a jury found that, at the time of trial, Gibson qualified as a sexually violent predator and thus that he had the requisite behavioral abnormality.

## II. Standard of Review

The sole issue in this appeal is the factual sufficiency of the jury's implied behavioral-abnormality finding.[2] In reviewing the factual sufficiency of such a finding, we ask whether a reasonable factfinder could have found, beyond a reasonable doubt, that the defendant had the required behavioral abnormality. *In re Commitment of Stoddard*, 619 S.W.3d 665, 668 (Tex. 2020); *In re Commitment of Browning*, No. 02-21-00417-CV, 2022 WL 16846741, at *2 (Tex. App.—Fort Worth Nov. 10, 2022, no pet.) (mem. op.); *In re Commitment of Coles*, No. 02-21-00173-CV, 2022 WL 1496544, at *5 (Tex. App.—Fort Worth May 12, 2022, no pet.) (mem. op.). Although we consider the entire record in this analysis, the jury remains the sole judge of the witnesses' credibility and the weight to be given their testimony; we cannot replace the jury's credibility determinations with our own. *Stoddard*, 619 S.W.3d at 668, 674; *Browning*, 2022 WL 16846741, at *2. And we presume that the jury resolved all disputed evidence in favor of its finding if a reasonable jury could have done so. *Stoddard*, 619

---

[2]Gibson filed a motion for new trial challenging the factual sufficiency of the implied behavioral-abnormality finding. *See* Tex. R. Civ. P. 324(b).

S.W.3d at 668, 674; *Browning*, 2022 WL 16846741, at *2. We examine the evidence that the jury could not have credited in favor of its finding, though, to determine whether this contrary evidence was so significant that it would have prevented a reasonable jury from reaching the behavioral-abnormality finding beyond a reasonable doubt. *See Stoddard*, 619 S.W.3d at 668, 674–75; *Browning*, 2022 WL 16846741, at *2; *Coles*, 2022 WL 1496544, at *5.

### III. The Evidence

In deciding whether Gibson had a behavioral abnormality, the jury heard evidence of Gibson's prior sexually violent offenses, his longstanding pattern of sexually deviant behavior, his continued lack of insight, and a forensic psychiatrist's evaluation of his condition.

### A. Sexually Violent Offenses

In 1997, when Gibson was 37, he fondled a sleeping ten-year-old boy's penis over the boy's clothing. The boy told his parents—at whose house Gibson was staying—and the parents kicked Gibson out of the home.

Two years later, Gibson, then married, repeatedly had oral sex with his wife's six-year-old grandson over the course of about six months. Gibson later admitted that he and the grandson had performed oral sex on one another on three to four different occasions.

Gibson pleaded guilty to and was convicted of indecency with a child by contact for his fondling of the ten-year-old and of aggravated sexual assault of a child

4

for his oral sex with the six-year-old.[3] *See* Tex. Health & Safety Code Ann. § 841.002(8)(A); Tex. Penal Code Ann. §§ 21.11(a)(1), 22.021. His respective 20-year and 35-year sentences ran concurrently, and he was still serving those sentences when the jury was asked to determine if he qualified as a sexually violent predator.[4]

## B.    Gibson's Sexual Deviance and Lack of Insight

Gibson admitted his offenses to the jury, but he emphasized the role of alcohol in his commission of the offenses and claimed that he would not have committed them had he not been drinking. He testified that, apart from his alcohol usage, he did not know why he had committed the offenses. He denied being—or ever having been—sexually attracted to young boys, and he denied having been attracted to the two specific boys he had abused.

Despite these denials, Gibson acknowledged engaging in several (in his words) "disturbing" behaviors. He admitted, for example, that he had a "fetish" for diapers, that the fetish began as early as age five, and that he had continued to wear diapers as "a coping mechanism" until his arrest for aggravated sexual assault more than 30 years

---

[3]Gibson does not dispute that indecency with a child by sexual contact and aggravated sexual assault of a child fall within the statutory list of "[s]exually violent offense[s]." *See* Tex. Health & Safety Code Ann. § 841.002(8)(A) (listing Penal Code Section 21.11(a)(1)—indecency with a child by contact—and Section 22.021— aggravated sexual assault—as "[s]exually violent offense[s]"); *see also* Tex. Penal Code Ann. §§ 21.11(a)(1), 22.021.

[4]Gibson's 1997 offense was discovered during the investigation of his 1999 aggravated-sexual-assault case, and he was convicted of both offenses at the same time.

later.[5] He conceded that the fetish was "pretty disturbing when [he] th[ought] about it" but insisted that the diapers were not sexual.

Similarly, Gibson acknowledged that he owned little boys' underwear and clothing and that he had been caught attempting to steal some from a store when he was in his 20s. But, as with the diapers, he insisted that the little boys' clothing was not sexual, explaining that the items were for him because he "was small for [his] age."

Gibson further admitted that, for multiple years before his convictions, he had maintained "a scrapbook" containing "pictures of [young] boys,"[6] on which pictures he had added adult penises. He admitted to having "masturbated around the [pictures],"[7] but once again, he insisted that the scrapbook was not sexual.[8]

---

[5]The State's forensic psychologist later testified that Gibson had recalled wearing diapers "up until about 12 years old," when his dad told him to stop, and that Gibson had "resumed in his 20s."

[6]Gibson testified that the pictured boys ranged in age from ten to 12, but he acknowledged that, during his deposition, he had stated he used images of boys as young as five.

[7]The State's expert testified that Gibson had admitted "that he would drink and then go and look at . . . his collections" and that "he said that's the only way he could perform . . . was when he was looking at those."

[8]Gibson explained the scrapbook as him "want[ing] to be virile like them" because, when he was young, he had been teased "because [he] couldn't have an erection."

**C.     Dunham's Behavioral-Abnormality Evaluation**

The State's expert—forensic psychologist Jason Dunham—evaluated Gibson for a behavioral abnormality that predisposed him to commit sexually violent acts. After interviewing Gibson and reviewing thousands of pages of records, Dunham diagnosed Gibson with two conditions related to his "sexual deviance": "pedophilic disorder" and "fetishism disorder."[9] Dunham testified that sexual deviance and pedophilic disorder were congenital or acquired conditions and that pedophilic disorder in particular was a "chronic condition" and "not something that goes away," analogizing it to a person's sexual orientation.

Given this chronic condition, Dunham repeatedly expressed concern over Gibson's failure to make "the connection that he's sexually aroused to young boys." He explained that Gibson's failure to understand the reason for his impulses prevented him from learning "what he c[ould] do to stop that," so he was "still dangerous . . . [and at] high risk to reoffend."[10]

---

[9]Dunham confirmed that another evaluator made similar diagnoses.

[10]Dunham rejected Gibson's attempts to blame his actions on alcohol, pointing out that, though alcohol "can be a disinhibitor," the majority "of the population's been intoxicated; but very few ever . . . sexually act out against young boys," and "[w]hat separates those people who do is not the intoxication" but "the deviancy towards the young boys."

The lack of understanding was one of the key "cognitive distortions" that, together with other "risk factors" indicative of recidivism,[11] led Dunham to conclude that Gibson had the requisite behavioral abnormality. Dunham walked the jury through the risk factors that supported his conclusion, noting Gibson's "pattern" of sexually deviant behavior that began with his sexual fetishes and "escalated' into sexually violent offenses; his "offending after detection" by the ten-year-old's family; the fact that "he [had] offended against boys" and "offended outside of the family" (both of which made Gibson "statistical[ly]" more likely to reoffend); the involvement of alcohol; his grooming of the six-year-old grandson; and his "emotional identification with children." Dunham acknowledged "protective" factors that decreased the likelihood of Gibson's reoffending—Gibson's age and lack of legal sanctions between his two offenses—and the fact that Gibson had scored well on two actuarial risk-assessment tests (the Static-99R[12] and Psychopathy Checklist Revised), but he explained why, in his opinion, those considerations were outweighed by others or were not relevant to Gibson's situation.[13]

---

[11]Dunham explained that "a risk factor is . . . something that is correlated with whatever you are trying to measure," so in the context of "sex offense, recidivism," risk factors "correlate[] with reoffending."

[12]Dunham explained that Gibson's age "ke[pt] his score down"; Static-99R scores range "from negative 3 to 12," and Gibson received "3 points off because he [was] over 60 years old."

[13]Dunham noted, for example, that Gibson's score on the Static-99R reflected below average risk, but he explained that the Static-99R "doesn't cover th[e] type of

## IV. Gibson's Challenges

Gibson acknowledges that his prior offenses, his chronic pedophilic disorder, Dunham's expert testimony, and numerous risk factors all supported the jury's implied behavioral-abnormality finding. *See In re Commitment of Stoddard*, No. 02-17-00364-CV, 2022 WL 247571, at *2–3 (Tex. App.—Fort Worth Jan. 27, 2022, no pet.) (mem. op. on remand) (affirming behavioral-abnormality's factual sufficiency when evidence showed, among other things, pedophilic-disorder diagnosis, sexually violent offenses, and defendant's denial); *In re Commitment of Born*, No. 02-19-00272-CV, 2020 WL 6788213, at *8–9 (Tex. App.—Fort Worth Nov. 19, 2020, no pet.) (mem. op.) (affirming behavioral-abnormality finding's factual sufficiency when evidence showed, among other things, two sexual offenses, "panoply of risk factors," and pedophilic-disorder diagnosis). Yet, he argues that three aspects of the evidence were fatally flawed and, if correctly viewed, prevented a reasonable jury from finding a behavioral abnormality beyond a reasonable doubt.

---

deviancy that [Gibson] has" or account for "how [a defendant] currently sees things," so it "[wa]s not designed for this type of case."

And although Gibson had completed a sex-offender education course, Dunham distinguished this "classroom" learning from a sex-offender treatment program and testified that "there [wa]s no literature out there that sa[id] that sex[-]offender education [as opposed to treatment wa]s . . . a protective factor." He further noted that, even after completing the sex-offender education course, Gibson did not understand that he was sexually aroused by children.

Specifically, Gibson contends that (1) Dunham's—and in turn, the jury's—behavioral-abnormality determination relied on Gibson's decades-old offenses, which were no evidence of whether he had a behavioral abnormality at the time of trial; (2) Gibson's lack of prior incarceration for sexual offenses meant that there was no evidence of prison's proving ineffective to deter him from reoffending and thus no evidence that he would have difficulty controlling his pedophilic impulses upon release; and (3) Dunham's behavioral-abnormality determination was undermined by his own description of the protective factors and actuarial tests that supported a contrary conclusion. But these criticisms are off the mark: the first two propose evidentiary limitations or requirements that do not exist, and the third asks us to usurp the jury's role by reevaluating the witnesses' credibility.

## A.     Decades-Old Sexually Violent Offenses

First, Gibson has not cited any caselaw to support the idea that an expert conducting a behavioral-abnormality evaluation (or a jury making a behavioral-abnormality finding) cannot consider a defendant's sexually violent offenses unless those offenses are recent.[14] And the very nature of the behavioral-abnormality determination belies such a limitation.

---

[14]Gibson did not object at trial to the reliability of Dunham's expert testimony, nor does he raise that issue on appeal. *See In re Commitment of Beasley*, No. 09-08-00371-CV, 2009 WL 3763771, at *3 (Tex. App.—Beaumont Nov. 12, 2009, pet. denied) (mem. op.) (noting that defendant's complaints regarding alleged "analytic[al] gap" and expert's weighing of factors went to the "reliability of the . . . expert's opinions, and consequently these complaints should have been presented to the trial court in a

Again, a "behavioral abnormality" is "a congenital or acquired condition" that "predisposes" a person to certain conduct. Tex. Health & Safety Code Ann. §§ 841.002(2), .003(a)(2). A "congenital" condition, by definition, "exist[s] at or dat[es] from birth." *Congenital*, Merriam-Webster, https://www.merriam-webster.com/dictionary/congenital (last visited August 13, 2024); *see Congenital*, Webster's Third New International Dictionary (reprt. 2021) (1961) (similar). And an acquired condition can develop at any time after birth. *Acquired*, Merriam-Webster, https://www.merriam-webster.com/dictionary/acquired (last visited August 13, 2024) (defining acquired in the context of "a disease or medical condition" as "developed after birth"; "not congenital or hereditary"); *see Acquired*, Webster's Third New International Dictionary (reprt. 2021) (1961) (similar). Logically, then, while the "congenital or acquired condition" must be present at the time of trial, it can be shown through evidence dating back to the defendant's birth.

Dunham expressly recognized as much in explaining his behavioral-abnormality evaluation to the jury. He testified that he "look[ed] at [Gibson's] patterns" over "the whole lifespan," not "just one bad day . . . [but] the whole pattern." And he noted that such historical information was important because "[i]t [wa]s the best predictor of future behavior." So Gibson's decades-old sexual offenses were relevant to whether he had a behavioral abnormality at the time of trial, and in

_____

manner that would have allowed the trial court to address the foundational data used by the experts").

11

fact, his actions before that were relevant too. Dunham noted Gibson's sexually deviant pattern of behavior throughout his life—including Gibson's early fetish for diapers and his "scrapbook" of young boys' modified pictures—he described Gibson's pedophilic disorder as a chronic condition, and he pointed to Gibson's lack of insight as evidence that this chronic condition continued to exist. *See In re Commitment of Rodriguez*, No. 05-17-00514-CV, 2018 WL 3387363, at *2–4 (Tex. App.—Dallas July 12, 2018, pet. denied) (mem. op.) (affirming behavioral-abnormality finding's legal and factual sufficiency when expert testified that defendant had "pedophilia—a lifelong condition" but defendant argued that State's evidence "pertained to his distant past behavior"); *Beasley*, 2009 WL 3763771, at *3–6 (affirming behavioral-abnormality finding's legal and factual sufficiency when expert testified that defendant had pedophilia but defendant argued that expert relied on "stale data").

In short, Dunham's (and the jury's) consideration of Gibson's decades-old offenses was in keeping with the nature of the behavioral-abnormality determination. Contrary to Gibson's contention, his offenses' age did not rob them of evidentiary value.

## B.    Recidivism and Difficulty Controlling Behavior

Gibson's second argument—that there was no evidence of a post-prison relapse and thus no evidence of his likely reoffending or lack of behavioral control—is similarly unavailing. The State was not required to wait for a post-prison relapse to show that Gibson was predisposed to sexual violence and had difficulty controlling

12

his behavior. Rather, the jury could rely on evidence of Gibson's past behavior to infer his current dangerousness and behavioral-control issues. *See Gonzalez*, 2022 WL 1183219, at *9 ("[A] jury may infer that a [defendant] has serious difficulty controlling his current behavior based on his past behavior." (quoting *Thompson*, 2020 WL 6066205, at *1)); *In re Commitment of Lopez*, 462 S.W.3d 106, 116 (Tex. App.—Beaumont 2015, pet. denied) (holding jury could "infer [defendant's] current dangerousness from [expert's] testimony, [defendant's] past behavior, and [defendant's] own testimony"). As Dunham testified, past behavior is a "predictor of future behavior."

And there was evidence that, even after Gibson's fondling of the ten-year-old boy had been discovered by the boy's parents, and even after Gibson had suffered consequences (such as being kicked out of the house) because of his actions, he continued indulging his sexually deviant fetishes and went on to commit multiple additional acts of sexual violence against his wife's grandson. Dunham explained that such "offending after detection" raised concerns regarding Gibson's reoffending. And he emphasized that Gibson's lack of insight into the root cause of his actions—his sexual attraction to young boys—further increased the risk of reoffending because Gibson could not understand "what he c[ould] do to stop that." Gibson continued to demonstrate the same lack of insight at trial, telling the jury directly that he was not and had never been sexually attracted to little boys. Given this testimony and Gibson's prior failure to control his behavior after detection and informal

13

punishment, the jury could have inferred that Gibson's incarceration was unlikely to yield behavioral control in the future.

## C.     Dunham's Credibility and Risk-Factor Prioritization

In Gibson's third and final argument, he criticizes Dunham for his failure to give greater weight to the protective risk factors and actuarial assessments that cut against a behavioral-abnormality finding.[15] In essence, Gibson claims that Dunham's opinion was not credible because he attributed more significance to certain risk factors over others. But this mirrors the argument the Texas Supreme Court rejected in *Stoddard*. *See* 619 S.W.3d at 668–78.

There, as here, the defendant challenged the factual sufficiency of the jury's behavioral-abnormality finding. *See id.* at 672–73, 676. The State's expert had testified to various risk factors that indicated the defendant was likely to reoffend, but the expert also noted several mitigating risk factors; the defendant claimed that the latter undermined the expert's behavioral-abnormality determination and rendered the evidence factually insufficient. *See id.* at 670–73. The Texas Supreme Court held that such re-weighing of the risk factors and expert testimony was inappropriate in a factual-sufficiency review and amounted to supplanting the jury's credibility

---

[15]Gibson emphasizes his low score on the Static-99R test and his lack of antisocial or psychopathic traits. *Cf. Coles*, 2022 WL 1496544, at *5–7 (affirming behavioral-abnormality finding's factual sufficiency when defendant argued that he was not antisocial or a psychopath and that "he [had] scored at average risk on the Static-99R").

14

determinations. *See id.* at 676–78. A factual-sufficiency review, the court explained, does not allow an appellate court to usurp the jury's role by deciding whether "the considerations [the expert] viewed as most significant . . . served to undermine the weight to be accorded [the expert's] testimony" or whether the expert's testimony was "[]sufficiently persuasive." *Id.* at 676–77 (discussing lower court's analysis). It was "the jury's right to determine the requisite weight to be given [the expert's] testimony," and an appellate court's "mere disagreement with the jury as to proper evidentiary weight and credibility cannot be the basis of a reversal on factual-insufficiency grounds." *Id.* at 676–78.

Here, then, we cannot accept Gibson's invitation to second-guess the jury's credibility determinations. Dunham detailed his behavioral-abnormality evaluation, identified risk factors that supported his diagnoses and opinion, and explained why he believed those risk factors outweighed the protective factors and test scores to the contrary. Indeed, Gibson acknowledges this testimony; he simply disagrees with Dunham's prioritizing certain considerations over others. But as the court clarified in *Stoddard*, we do not decide whether the jury should have found an expert's reasoning "insufficiently persuasive" based on his weighing of risk factors. *Id.*; *see Browning*, 2022 WL 16846741, at *7–8 (affirming behavioral-abnormality finding's factual sufficiency and rejecting argument that expert and jury failed to give sufficient weight to defendant's advanced age—a protective factor). The jury was free to believe or disbelieve Dunham, and it chose to believe him. *See Browning*, 2022 WL 16846741, at

15

*2 (reiterating that "the jury may believe all, part, or none of the witnesses' testimony" and it "decides which expert to believe").

In sum, none of Gibson's factual-sufficiency arguments have merit. To the extent that his arguments highlight evidence that could not have been credited in favor of the behavioral-abnormality finding—such as the existence of protective risk factors and his actuarial-test scores—that evidence was not so significant that it prevented the jury from reaching its finding beyond a reasonable doubt. *See Stoddard*, 619 S.W.3d at 668, 674–75.

We overrule Gibson's sole issue.

## V. Conclusion

Having overruled Gibson's sole issue, we affirm the trial court's civil-commitment judgment. Tex. R. App. P. 43.2(a).

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: August 22, 2024

16